

U.S. Department of Justice

United States Attorney
Eastern District of New York

TJS:MKP
F. #2014R01914

271 Cadman Plaza East
Brooklyn, New York 11201

April 5, 2017

<u>By Hand and ECF</u>

The Honorable Pamela K. Chen
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Alberto Randazzo
                 Criminal Docket No. 14-189 (S-2) (PKC)

Dear Judge Chen:

      The government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for April 19, 2017 at 10:00 a.m. On July 12, 2016, the defendant pleaded guilty to two counts of conspiracy to sexually exploit a child and one count of receiving child pornography. In his sentencing memorandum and his personal letter to the Court, the defendant Alberto Randazzo requests the mandatory minimum sentence of fifteen years. In support of this request, the defendant tries to have it both ways—claiming to accept responsibility but also offering various excuses for his reprehensible conduct. For the reasons set forth below, including the seriousness of the defendant's crimes, his lack of remorse and the need to protect the public, the government asks that the Court impose a sentence of imprisonment of at least 35 years.

I.    Background

      The defendant first came to the attention of law enforcement in or around February 2013. (Pre-Sentence Investigation Report ("PSR") ¶ 117). At that time the defendant was a sergeant with the New York City Police Department ("NYPD"). His then-girlfriend contacted NYPD's Internal Affairs Bureau ("IAB") after discovering text messages on the defendant's cellphone in which he expressed a desire to have sex with a woman on her child's bed. She had also discovered that the defendant's emails contained homemade child pornography, including images of a woman performing oral sex on a male infant and a woman performing oral sex on a female infant. Randazzo's girlfriend also reported to IAB that she feigned an interest in the defendant's proclivities and then the defendant sent her disturbing text messages as well. For example, he confessed to being sexually attracted to mothers performing sex acts on their children, and he told his girlfriend that an eight-year-

old girl who was at a party they had attended together had aroused him by opening her mouth and flirting with him.  The defendant also told her that he wanted to have children with her who they could sexually abuse together.  For example he wrote, "Not only do I want to fuck you while you are breastfeeding our little girl.  I want to pull out and cum on your tits. Then make her continue sucking with my cum on your nipples" and "I want to teach our son how to fuck you with a dildo!"

Following his girlfriend's report, NYPD executed a search warrant on the defendant's apartment.  During a review of the defendant's computer and cellular telephones, law enforcement discovered child pornography images and videos and numerous communications with women in which Randazzo solicited them to sexually abuse children to whom they had access.  He met these women on a variety of online dating websites including Ashley Madison

On or about February 19, 2013, the defendant was arraigned on state charges including Promotion of a Sexual Performance by a Child Less Than 17 and was granted bail.  Less than a year later, while he was out on bail, the defendant was identified by the Department of Homeland Security, Homeland Security Investigations ("HSI") as someone who was downloading child pornography through a peer-to-peer service.  The child pornography the defendant downloaded included videos of a woman performing oral sex on a prepubescent male and a man having vaginal intercourse with a prepubescent girl.  A federal search warrant was authorized, the defendant was arrested and the instant federal case commenced.

The search of the defendant's electronic devices revealed disturbing conversations with numerous women, some of which were summarized in the PSR and in the government's letter, dated March 21, 2017, responding to the defendant's PSR objections ("PSR Response").  There are sufficient facts to prove that at least five women went beyond having sexual conversations with the defendant and agreed to sexually abuse children for the defendant, either by performing sexual acts or simulating sexual acts:

- **Keira Norton (co-conspirator in Count 1 of conviction)**—In or around December 2010, the defendant and Norton began participating in Skype video calls in which Norton touched an infant sexually at the defendant's direction.  The defendant taped those video calls with his iPhone and they were recovered from his devices.  On those videos Norton can be seen masturbating herself with the victim's body (while he was wearing only a diaper), displaying the victim's naked genitals to the defendant and simulating oral sex on the victim.  Throughout the videos the defendant can be heard directing Norton to stroke the victim's penis, speak "dirty" to him and perform oral sex on him.  Randazzo can also be heard masturbating on these calls and made clear

he was filming. At one point he said, "When I'm ready to come, I'll put the camera down."

- **Lori Bauer**—In and around and between January and February 2011, Bauer sent the defendant at least four videos in which she sexually abused a three-year-old at the defendant's direction. In one of the videos the victim is nude from the waist down and rubbing his genitals on Bauer's genitals, which are covered only by underwear. In two other videos, the victim's penis is visible and he rubs it on Bauer's buttocks. The victim can be heard speaking in the videos.

- **Jennie Lemay**—In or around July 2011, the defendant and Lemay prearranged Skype video calls where they planned to have Lemay sexually abuse an eight-year-old while the defendant watched. Although the government is not in possession of videos of those calls, the defendant and Lemay engaged in a real-time exchange of messages while they were on some of the video calls. These exchanges reveal that during at least one video session Lemay attempted to simulate performing oral sex on the victim using a popsicle. When the victim refused to cooperate, the defendant got frustrated and wanted her to continue trying. In a post-arrest statement, Lemay also confessed to simulating sexual intercourse with the victim over Skype and touching his penis over his underwear.

   The defendant and Lemay were also in communication in or around September 2011 and discussed meeting in person. On or about September 10, 2011 the defendant said to Lemay, "I get off at midnight. I can leave NYC at midnight and be there at like 3 or 4am." Lemay responded, "Yes baby that works . . . [c]ome to my back door and slip inside the sliding glass door. . . . Slip into bed with me and [the victim]." Randazzo said, "Ok that would be great. But are you sure you can suck his cock without him waking up? . . . I would want you to give him nyquil anyway. This way he's sleeping and you can move him around etc." Later that night, when the plan to meet that night appeared to have been abandoned, the defendant said to Lemay, "Ok so I hear that melatonin is an over the counter sleeping pill that will knock [the victim] out for the night. We can have all the fun we want then ;)." Lemay responded, "Oh cool. . . What form is it? A pill?" and Randazzo said, "Yes I think so. Would that be okay? You can tell him it's a vitamin. I hear it will make him sleep all night. Maybe we

3

can have a skype session soon and try the pill out." On or about September 14, 2011 the defendant asked Lemay, "What will you show me on skype mommy?" and she responded, "What I will do with you baby. How I will suck you and [the victim]." On or about September 18, 2011, Lemay said to Randazzo, "I will give him something with his meds. . . . I will let you know as soon as he's asleep."

On or about April 18, 2012, the defendant and Lemay met in a hotel room with the victim and gave him Ambien and alcohol so that Lemay could sexually abuse the victim while Randazzo filmed it. Prior to the meeting the defendant and Lemay had discussed medicating him so that he would sleep through any sexual abuse. In her post-arrest statement she acknowledged bringing the victim to the hotel and giving him Ambien and alcohol, and she also said that the defendant brought a camcorder to the hotel. While Lemay currently maintains that no sexual abuse actually took place at the hotel, the victim has been forensically interviewed and remembers going to a hotel room with Lemay and a man, being drugged and waking up wearing different pants than he had gone to sleep wearing.

- **Leigh Marcini (co-conspirator in Count 3 of conviction)**—In and around and between April 2012 and May 2012 the defendant and Marcini engaged in sexually explicit chats discussing her sexual abuse of a two-year-old. Among other things, the defendant told Marcini that he wanted her to "suck his little cock." Throughout their exchanges, the defendant and Marcini discussed sexually explicit pictures she had taken of the victim and sexually explicit pictures she would try and take in the future. In or around May 2012, the defendant and Marcini discussed a plan to meet at a hotel with the victim. In the week before meeting, the defendant said to Marcini, "A blow job is only the beginning. I saw how hard he gets and I know you can leverage his hard dick to fuck you . . . We just need you to lay down and then have him on top of you while he's got a nice hard dick!" That afternoon Randazzo also sent a message saying, "I can't wait to commit crimes with you in that hotel room." Marcini has told the government that she did meet with the defendant in a hotel room and that she and the defendant had sexual intercourse while the victim was in the room and that she performed oral sex on the victim as well.

4

- **Andreana Winters**—In and around September 2012, defendant solicited pictures and a video of Winters performing oral sex on an infant.

In his communications with Lemay the defendant also admitted to having ejaculated on the foot of a minor female (presently unidentified) while she was sleeping and while her mother held the defendant's penis.

The defendant's conversations with other women about sexually abusing children are also relevant, even where the government cannot prove that the women acquiesced to the defendant's requests. For example, over the course of two days alone in September 2011—the same month in which he was arranging Skype sessions with Lemay— he exchanged sexual text messages about children with three women and requested pictures from two of them.

On or about September 26, 2011, the defendant said to one woman ("Woman 1"), "I want to see your tongue in his ass and I want to see you licking his little dick!" Woman 1 responded, "Yea maybe . . . lol." The defendant pushed, "Well can you see it happening? I want to do that with our daughter as well. I would need you to hold her little legs open while I lick her pussy!" Woman 1 wrote back, "Yes baby." Later that night, Woman 1 and the defendant discussed having children and the defendant said, "If it's a boy he will learn how to eat mommys pussy, finger fuck her etc. If it is a girl she will learn how to give head because my cock will be in her little mouth all the time ;)." Then Woman 1 said to the defendant, "Ok daddy, I want to lie on the bed naked with my legs spread open while [Woman 1's son] lays his head in btwn [my] hairy pussy." The defendant said, "Omg. Can you take a pic with [your son's] hand on your pussy for daddy?" and Woman 1 responded, "Later baby when we go back 2 the room." The defendant responded, "Omg!! I better get my camera ready :) I want to see him put his entire little hand in your pussy. He can fist you :)." A few hours later, the defendant texted Woman 1, ":) where's our boy?" and Woman 1 responded, "He wouldn't sit still. I tried baby. I will try again ltr."

In the midst of texting Woman 1, the defendant was also texting another woman ("Woman 2"). Clearly having had similar conversations before, Woman 2 said to him, "My son is here watching me shower" and the defendant responded, "Is he looking at your sexy body?" After some back-and-forth the defendant says, "Omg please take a pic of him looking at your body. Maybe in the mirror! . . . Lay next to your son while naked or wearing bra and panties and take a picture for me!! . . . Can you take a vid [of] your son. Just stroke his chest and ask him if he likes mommys body ;-)?" Woman 2 attempted to steer the conversation to sexual activity involving only her and the defendant and the defendant said, "No cock for you!" She asked why and he said, "You know why! You had me all excited about my favorite topic and then you get all scared to have a little innocent fun." Woman 2 then explained to the defendant that she's "not gonna fuck up [her] kids" and Randazzo stopped communicating with her.

5

The next day he sent a message to a woman ("Woman 3") and said, "Hey can you tell me something sexual about your son or daughter that will make me cum? I'm still hard sis :(", but he did not receive a response.

II.     Guidelines Calculation

In the plea agreement, the government estimated the defendant's total adjusted offense level to be 40, which carries a Guidelines range of imprisonment of 292-365 months with a Criminal History Category of I. In the plea agreement, the government reserved its rights to take a position as to where within the Guidelines the defendant's sentence should fall. Additionally, the plea agreement made clear that the Government was not bound by its estimate in the agreement.

On December 21, 2016, the Probation Department released the PSR, which calculated the total offense level as 45. A total offense level of 45 is treated as a level 43 and carries a Guidelines range of life imprisonment, but because the statutorily authorized maximum sentence is 80 years, the restricted Guidelines range is 80 years.[2]

On or about February 22, 2017, the defendant submitted objections to the PSR, but the only actual Guidelines objections he made were to an aggravating role increase under § 3B1.1(c) and a distribution increase under § 2G2.1(b)(3). The PSR Response addressed these objections, noting that they are unavailing under United States v. Brown, 613 Fed. App'x 58, 60 (2d Cir. 2015)(rejecting nearly identical arguments where defendant, who was incarcerated for a separate crime, conspired to have a woman sexually exploit children to produce child pornography, which she was to provide to the defendant once he was released from prison). The PSR Response also requested that the Probation Department include a two-level enhancement for Count Three because the offense involved the commission of a sexual act (namely oral sex on a child) and a four-level enhancement for Count Four because the child pornography contained sadistic or masochistic conduct (namely intercourse with a prepubescent child).

The Probation Department has not yet responded to either the defendant's or the government's objections. Given that the government's objections would not alter the

---

[2] The PSR calculated the restrictive Guidelines range as 360 months to 80 years. The government's position is that the Guidelines should be 80 years. See United States v. Brown, 843 F.3d 74, 82 (2d Cir. 2016) (applying § 5G1.2(d) and finding that in case where the defendant had an offense level of 43 but where the statutory maximum of the five different child pornography counts was 110 years, that 110 years was the correct Guidelines range). The Probation Department has advised the government that it is currently considering this issue and expects to issue an addendum clarifying the appropriate Guidelines range.

6

restricted Guidelines range, the government requests that the Court apply the Guidelines range of 80 years' imprisonment.

III.   A Sentence of at least 35 Years' Imprisonment is Appropriate in Light of 18 U.S.C. § 3553(a) Considerations

   A.   Legal Standard

The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 543 U.S. 220, 258-60 (2005). In Booker, the Supreme Court held that sentencing courts must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted) (emphasis added). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. Title 18, United States Code, Section 3553(a) provides in pertinent part:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set for in paragraph (2) of this section. The court, in determining the particular sentence to be imposed, shall consider:
>
> (1) the nature and circumstances of the offense . . . ;
>
> (2) the need for the sentenced imposed --
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; . .
>
> (D) to provide the defendant with needed educational or vocational training; medical care, or other corrections treatment in the most effective manner; . . . .

B. <u>Nature and Circumstances of the Offenses</u>

The defendant's crimes are nothing short of horrifying. Over a span of two years, he targeted an unknown number of women and persuaded at least five of them to sexually abuse children for his pleasure. The defendant also downloaded child pornography from the Internet, which—by his own admission—he had been doing for seven years before he was caught.

The defendant showed no limits to the lengths he was willing to go to satisfy his criminal desires. He not only solicited photos and videos of women abusing children over email and Skype, but also drove hours to Massachusetts and Pennsylvania in order to see women sexually abuse children in person. He showed no qualms about drugging a child so that he could watch the child be molested. And as his statements to Marcini make abundantly clear, if the opportunity had arisen he would have happily had the women go beyond oral sex and engage in sexual intercourse with the children if physically possible. The defendant also incredibly claims he had no "specific intent to violate any law" when in fact he told Marcini, "I can't wait to commit crimes with you in that hotel room."

Additionally, the defendant committed his crimes with callous disregard for the effects his actions would have on the child victims. Absent Randazzo's inducement and persuasion, it is unlikely any of the women he solicited would have sexually abused children.

[redacted]

C. <u>History and Characteristics of the Defendant</u>

The defendant seeks a mandatory minimum sentence by claiming that he "has been an extremely productive member of society for all of his life" and that he is "ethical, trustworthy, loving" and "due to his affliction, made an uncharacteristic error in judgment." The defendant was living a lie and anyone who saw him as ethical and trustworthy simply did not know his true nature. While the defendant was publicly pretending to be a dedicated police officer, privately he was disgracing his badge by victimizing the most vulnerable members of the community that he was charged with protecting. His appeals to acts of heroism during his police career are manipulative attempts to avoid taking responsibility for the grievous harm he has caused.

Furthermore, the narrative the defendant has constructed for the Court in an attempt to garner sympathy is premised on a lie. The central theme of the defendant's sentencing memorandum and his letter to the Court is that he developed an addiction to child pornography following the death of his friend and police partner and that he believed he did not need help because he had been able to conquer a different addiction—gambling—by quitting "cold turkey." This story falls apart upon a review of the defendant's text messages with the former girlfriend who contacted IAB. While the defendant claims he had stopped gambling in 2006, in these messages from late 2012 and early 2013 the defendant referred to trips he was taking to Atlantic City and Las Vegas and on February 3, 2013—the night of that year's Super Bowl and just two weeks before the defendant's arrest—he said he had a $1,000 bet on the game. Additionally, Marcini has told the government that Randazzo planned to visit a casino in Bethlehem, PA after he left the hotel where he had met with her and a child. The defendant also submitted a psychiatric report that is based on a minimized account of his crimes. For example, the defendant never mentioned Bauer to Dr. Kreuger and he did not tell Dr. Kreuger that Marcini, at Randazzo's request, performed oral sex on a toddler in front of him.

The defendant's letter to the court is also notable for another reason. In its seven single-spaced pages, while he speaks at length about what he has endured due to his crime and apologizes to his mother, father, and stepmother, apart from one paragraph where he abstractly references harm that victims of child pornography feel in knowing their images are still in the world, he makes not one reference to the children he knows he victimized. It seems that much as they did not warrant his compassion during his crimes, he does not believe they warrant it now.

On the whole, the defendant lived a privileged life that most criminals who enter this Court could never dream of having. Although he claims to have had some difficulties in his childhood, his parents remain supportive. He was educated and had a great career, an apartment, a car and properties in other states. The truth is that the defendant is an egomaniac who was willing to do anything to get what he wanted—regardless of the collateral consequences. The clearest evidence of this is his sexual exploitation of numerous children, but further evidence is the email he wrote to a different ex-girlfriend threatening her if she refused to end a pregnancy. After being ordered not to contact her, the defendant sent her an email that said, "I fuckin hate your guts. I'm getting to that point again. I don't know what I am capable of doing if you don't get this abortion. Watch your back accidents happen all the time. I am not happy about it and you are ruining my life and I am not going to sit back and let you do that. You have the babies, I am going to be there and I am not going to make it easy for you. You fuckin selfish cunt." In his objections to the PSR, the defendant excused and minimized this threat, writing that he was "twenty-eight years old" and that the girlfriend had "feigned a pregnancy and set fire to his apartment" after the defendant broke up with her. There is no support for the truth of the defendant's claims (except of course that he was a grown man), but regardless, what is relevant is that he threatened a woman with implied physical violence because he believed she had become pregnant with his child, something that—in keeping with his character—the defendant apparently believed he had no responsibility over.

3.   Deterrence

The Court's sentence should also further the aims of general and specific deterrence. U.S.S.G. § 3553(a)(2)(B), (C). Here, both are at issue. Although this is the defendant's first conviction, even under the defendant's account, he had been looking at child pornography for at least seven years and engaging in the sexual exploitation of children for two. He also admits that he continues to masturbate three times a week thinking about mothers sexually abusing their minor sons. In addition, his commission of additional crimes involving child pornography while on bail in the state case demonstrates his willingness to flout the law to satisfy his urges.

The need for general deterrence in this case is high. Other would be abusers need to understand that our society will not tolerate the sexual abuse of children and that the penalties associated with that crime will be severe, regardless of the excuses.

4.   Need to Avoid Unwarranted Sentencing Disparities

The defendant claims that his crimes do not rise to the level of a "typical" § 2G2.1 offender, but the cases he cites himself demonstrate that a severe sentence is warranted and that the sentence *he suggests* would result in an unwarranted sentencing disparity. The defendant wants credit for not having tortured the victims and for not having profited from his production of child pornography, but arguably what he did was worse. ▓▓▓▓▓▓▓▓▓

In addition, a sentence of at least 35 years is consistent with other sentences imposed for similar or less severe conduct. For example, in United States v. Baslan, 13-CR-220 (RJD), Judge Dearie sentenced the defendant to 36 years' imprisonment following his conviction for conspiring to sexually abuse a six month old, two year old, and drug and sexually abuse a seven year old. Importantly, Baslan received that sentence despite never having accomplished his scheme or victimizing any children due to the government's intervention. In United States v. Schaffer, 12-CR-430 (ARR), Judge Ross sentenced the defendant to 300 months' imprisonment for coercing and enticing a fifteen year old to engage in sexual conduct. In United States v. Brooks, 12-CR-166 (RRM), Judge Mauskopf sentenced the defendant to 360 months' imprisonment for sexually abusing a ten year old. In perhaps the most apposite case, United States v. Ledee, 11-CR-175 (NGG), Judge Garaufis sentenced the defendant to 325 months' imprisonment for soliciting one mother to sexually abuse her eight-year-old daughter on several occasions.

IV.   Conclusion

For the foregoing reasons, the government asks that the Court impose a sentence of at least 35 years' imprisonment. This sentence is sufficient but not greater than necessary to meet the aims of § 3553. It is also a fair sentence which is consistent with other sentences in this district. Such a sentence would also adequately reflect the seriousness of the defendant's crimes, which involved at least five minor victims in addition to the children in the child

10

pornography videos he downloaded and the danger that the defendant may pose to would-be victims in the future.

V. Sealing

The government respectfully requests that this unredacted letter be filed under seal. The government's letter necessarily identifies the minor victims in this case. The Crime Victims' Rights Act recognizes a victim's "right to be treated with fairness and with respect for the victim's dignity and privacy." 18 U.S.C. § 3771. In addition, the Second Circuit has recognized that the privacy interests of third parties may justify sealing. United States v. Amodeo, 71 F.3d 1044, 1050-51 (2d Cir. 1995) (privacy interests of third parties may be compelling reason justifying sealing).

Under these circumstances, the interest of the victim's privacy outweighs the public's qualified right to access. As the facts set forth above provide support for the "specific, on the record findings" necessary to support sealing, Lugosch v. Pyramid Co., 435 F.3d 110, 120 (2d Cir. 2006), the government respectfully requests that the Court record those findings and file this letter under seal.

The publicly filed government memorandum redacts information that identifies victims.

        Respectfully submitted,

        BRIDGET M. ROHDE
        United States Attorney

By:    /s/
        Tyler J. Smith
        Moira Kim Penza
        Assistant U.S. Attorneys
        (718) 254-6186/6454

cc:    Anthony DiFiore, Esq. (by Encrypted Email)
       Victoria Main (Probation Department) (by Encrypted Email)